## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CRIMINAL NO.** |
| | : | |
| | : | **VIOLATIONS: 18 U.S.C. §§ 371, 1341, 2,** |
| | : | **981, 28 U.S.C. § 2461** |
| **v.** | : | **(Conspiracy to Defraud the United States,** |
| | : | **Mail Fraud, Causing an Act to Be Done,** |
| | : | **Forfeiture)** |
| **EDWARD CHUA,** | : | |
| | : | **UNDER SEAL** |
| **Defendant.** | : | |

### INFORMATION

The United States Attorney and the United States Department of Justice, Criminal

Division, Fraud Section, charge that at all times material to this Information:

### INTRODUCTION

1.      EDWARD CHUA ("CHUA") was the owner of EMMCCO and ECCO, which

were exporting companies in the business of purchasing United States goods on behalf of clients

in the Philippines and shipping those goods overseas.  From in or about November 1999 through

January 2005, CHUA, through EMMCCO and ECCO, acted as a purported "exporter" in

approximately $10 million worth of fraudulent loan transactions, falsified documents sent to

United States banks and to the Export-Import Bank of the United States (the "Ex-Im Bank"), and

misappropriated approximately $10 million in loan proceeds that were guaranteed by the Ex-Im

Bank.

2.      Co-Conspirator 2 ("CC-2") was a loan broker living in Manila, Philippines.  From

in or about November 1999 through January 2005, CC-2 brokered approximately $10 million in

fraudulent loan transactions in which CHUA acted as an exporter.  As a loan broker, CC-2 would

identify purported borrowers in the Philippines and lending banks in the United States and then assist borrowers in executing loan agreements with the banks and the Ex-Im Bank. Once the loans were finalized, CC-2 instructed CHUA to prepare false loan documents, submit the false loan documents to the lending banks and to the Ex-Im Bank, and then misappropriate the loan proceeds.

3.    The Ex-Im Bank was an independent agency of the executive branch of the United States and located in Washington, D.C. It was also the official export credit agency of the United States. The mission of Ex-Im Bank was to assist in the export of United States goods and services to companies overseas. One of the ways Ex-Im Bank fulfilled this mission was by issuing loan guarantees to United States lending banks on behalf of creditworthy foreign companies for the purpose of purchasing United States goods. Once Ex-Im Bank issued a loan guarantee, if the foreign borrower defaulted on its loan repayments to a United States bank, the Ex-Im Bank paid the amount of the outstanding loan to the United States bank. Before issuing a loan guarantee, Ex-Im Bank required that a United States exporter - the person or entity shipping the United States goods on behalf of the foreign borrower - certify to Ex-Im Bank the type, amount, and value of the United States goods that it would be shipping and that the goods shipped were made in the United States.

4.    Relying on information provided by CHUA and others, the Ex-Im Bank provided lending banks with approximately $10 million in loan guarantees, promising that the Ex-Im Bank would reimburse the banks for any losses incurred in the loan transactions. As a result of defaults affiliated with the fraudulent CHUA loan transactions, the Ex-Im Bank has paid approximately $9 million in claims to the lending banks.

## COUNT ONE
### (CONSPIRACY TO DEFRAUD THE UNITED STATES)

<u>THE CONSPIRACY</u>

5.     Paragraphs 1 through 4 of this Information are realleged and incorporated by reference as if set out in full.

6.     From in or about November 1999 through January 2005, in the District of Columbia and elsewhere, CHUA, CC-2, and others known and unknown did unlawfully and knowingly agree, combine and conspire together and with each other and others to defraud the United States and agencies thereof and to commit offenses against them, to wit:

    a.     to defraud the United States of and concerning its governmental functions and rights, including its right to have the business of the Ex-Im Bank conducted honestly and impartially, free from corruption, fraud, improper and undue influence, dishonesty, unlawful impairment and obstruction, in violation of Title 18, United States Code, Section 371;

    b.     to defraud the United States of and concerning its right to have its officers and employees, and particularly the personnel of the Ex-Im Bank, free to transact the official business of the United States unhindered, unhampered, unobstructed and unimpared by the exertion upon them of dishonest, corrupt, unlawful, improper and undue pressure and influence, in violation of Title 18, United States Code, Section 371;

    c.     to defraud the Ex-Im Bank, an agency of the United States, to obtain money and property by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 371; and

    d.     to knowingly devise, and intend to devise, through the use of the mail, a scheme and artifice to defraud the United States and the Ex-Im Bank, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, in violation of Title 18, United States Code, Section 1341.

3

## A GOAL OF THE CONSPIRACY

7.    A goal of the conspiracy was for the co-conspirators, including CHUA, to unlawfully enrich themselves by submitting false and fraudulent information to the Ex-Im Bank, through the lending banks, to obtain and misappropriate the loan proceeds.

## THE MANNER AND MEANS OF THE CONSPIRACY

8.    To achieve the goal of the conspiracy, CHUA, CC-2, and others used the following manners and means, among others:

A.    CC-2 identified purported borrowers in the Philippines and lending banks in the United States and assisted Philippine borrowers in executing loan agreements with the lending banks and the Ex-Im Bank;

B.    CC-2 instructed CHUA to prepare false documents that would be submitted to the lending banks and the Ex-Im Bank to facilitate the fraudulent loan transactions;

C.    CHUA prepared false documents stating that United States goods had been purchased and shipped to the Philippine companies and then submitted those documents to Ex-Im Bank, through the lending banks; and

D.    CHUA received the proceeds of the bank loans, retained a portion of that money for his own personal benefit and use, and then transferred millions of dollars of proceeds to foreign bank accounts, including accounts owned and controlled by CC-2.

## OVERT ACTS IN FURTHERANCE OF THE CONSPIRACY

9.    Within the District of Columbia and elsewhere, in furtherance of the above-described conspiracy, and in order to carry out the goal thereof, CHUA, CC-2, and others known and unknown, committed the following overt acts, among others:

4

A.      In or about November 1999, CHUA met with CC-2 and agreed that CHUA, through EMMCCO, would act as "exporter" in loan transactions brokered by CC-2 between Philippine borrowers and United States lending banks, in which the Ex-Im Bank was guaranteeing the loans.  CC-2 agreed to pay CHUA a fee of between 1.5-5% of the value of the purported goods to be shipped.

B.      In or about November 1999, CC-2 instructed CHUA that lending banks would not pay loan proceeds to EMMCCO  until the banks and the Ex-Im Bank received a Commercial Invoice, Packing List, Bill of Lading, and Ex-Im Bank Supplier's Certificate documenting the amount, value, and origin of United States goods shipped to the Philippines.

C.      From in or about November 1999 through January 2005, CHUA prepared false Commercial Invoices and Packing Lists, documenting approximately $10 million worth of United States goods that he had purportedly purchased and shipped to the Philippine borrowers.

D.      From in or about November 1999 through January 2005, CHUA caused the preparation of false Bills of Lading by sending the false Commercial Invoices to a freight forwarder for the purpose of creating Bills of Lading that appeared to match the description of goods contained on the false Commercial Invoices.

E.      From in or about November 1999 through January 2005, CHUA prepared false Ex-Im Bank Supplier's Certificates certifying that he had purchased and shipped approximately $10 million worth of United States goods to the Philippine borrowers.

F.      From in or about November 1999 through January 2005, CHUA sent to Ex-Im Bank, through the lending banks, the Commercial Invoices, Packing Lists, and Ex-Im Bank Supplier's Certificates that he prepared and the Bills of Lading that he caused to be prepared, as

proof that he had purchased and shipped approximately $10 million worth of United States goods to the Philippine borrowers.

      G.    From in or about November 1999 through January 2005, EMMCCO and ECCO received approximately $10 million in loan proceeds from the lending banks based on CHUA's false representations to the lending banks and the Ex-Im Bank that EMMCCO and ECCO had spent approximately $10 million to purchase United States goods and had shipped those goods to the Philippines. CHUA and CC-2 knew at the time that CHUA had actually spent an amount materially and substantially less than $10 million on the United States goods purchased and shipped to the Philippines. After receiving the approximately $10 million in fraudulent loan proceeds, CHUA kept approximately $300,000 of the loan proceeds and transferred approximately $9 million of the loan proceeds to bank accounts owned or controlled by CC-2 and others.

**(Conspiracy to Defraud the United States, in violation of Title 18, United States Code, Section 371)**

**COUNT TWO**
**(MAIL FRAUD)**

      10.    Paragraphs 1 through 4 and 9 of this Information are realleged and incorporated by reference as if set out in full.

      11.    From in or about November 1999 through January 2005, in the District of Columbia, and elsewhere, CHUA, along with others known and unknown, did knowingly devise and intend to devise a scheme and artifice to defraud the Ex-Im Bank, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises,

and for the purpose of executing such scheme used Federal Express, a commercial interstate

carrier.

12.    On or about February 12, 2004, CHUA, for the purpose of executing the

scheme and artifice to defraud, did knowingly cause to be delivered through Federal Express, a

commercial interstate carrier, an Ex-Im Bank Supplier's Certificate to UPS Capital Business

Credit, knowing at the time that it would be forwarded to the Ex-Im Bank and that the pretenses,

representations, and promises contained in the Ex-Im Bank Supplier's Certificate were false

when made.

**(Mail Fraud, Causing an Act to be Done, in violation of Title 18, United States Code, Sections 1341 and 2)**

## FORFEITURE

13    As a result of the mail fraud offense alleged in Count Two of the Information,

which is realleged and incorporated by reference for the purpose of alleging forfeitures to the

United States of America pursuant to Title 18, United States Code, Section 981, and Title 28,

United States Code, Section 2461(c), defendant CHUA shall, upon conviction of such offense

alleged in the Information, forfeit to the United States all property, real and personal, which

constitutes or is derived from proceeds traceable to the mail fraud offense, wherever located, and

in whatever name held, including, but not limited to a sum of money equal to the amount of

proceeds obtained as a result of the mail fraud in violation of Title 18, United States Code,

Section 1341. By virtue of the offense charged in Count Two of the Information, any and all

interest that the defendant has in the property constituting, or derived from, proceeds obtained

directly or indirectly, as a result of such offenses is vested in the United States and hereby

forfeited to the United States pursuant to Title 18, United States Code, Section 981, in

conjunction with Title 28, United States Code, Section 2461(c).

    14.    In the event that any property described above as being subject to forfeiture, as a

result of any act or omission by the defendant:

    (a)  cannot be located upon the exercise of due diligence;

    (b)  has been transferred or sold to or deposited with a third person;

    (c)  has been placed beyond the jurisdiction of the Court;

    (d)  has been substantially diminished in value; or

    (e)  has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 981, and

Title 28, United States Code, Section 2461, to seek forfeiture of any other property of CHUA up

to the value of the above described property in paragraph 9(A)-(G).

**(Forfeiture, Title 18, United States Code, Section 981; Title 28, United States Code, Section 2461)**

JEFFREY A. TAYLOR
United States Attorney
In and For the District of Columbia

By:

MICHAEL K. ATKINSON
D.C. Bar # 430517
Assistant United States Attorney
Fraud and Public Corruption Section
555 4th Street, N.W.
Washington, D.C.  20530
(202) 616-3702

STEVEN A. TYRRELL
Chief, Fraud Section
Criminal Division
United States Department of Justice

By:

HANK BOND WALTHER
D.C. Bar # 477218
Trial Attorney
Fraud Section, Criminal Division
United States Department of Justice
1400 New York Avenue, NW
Washington, D.C. 20005
(202) 257-6176

Date:    April 26, 2007