## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CRIMINAL NO.** |
| | : | |
| | : | **VIOLATIONS:  18 U.S.C. §§ 371, 1341, 2,** |
| | : | **981, 28 U.S.C. § 2461** |
| **v.** | : | **(Conspiracy to Defraud the United States,** |
| | : | **Mail Fraud, Causing an Act to Be Done,** |
| | : | **Forfeiture)** |
| **EDWARD CHUA,** | : | |
| | : | **UNDER SEAL** |
| Defendant. | : | |

## STATEMENT OF THE OFFENSE

1.      From in or about November 1999 until January 2005, EDWARD CHUA ("CHUA") was the owner of EMMCCO and ECCO, which were exporting companies in the business of purchasing United States goods on behalf of clients in the Philippines and shipping those goods overseas.  From in or about November 1999 until January 2005, CHUA, through EMMCCO and ECCO, acted as a purported "exporter" in approximately $10 million worth of fraudulent loan transactions, falsified documents sent to United States banks and to the Export-Import Bank of the United States (the "Ex-Im Bank"), and misappropriated approximately $10 million in loan proceeds that were guaranteed by the Ex-Im Bank.

2.      In or about October 1999, CHUA met with a co-conspirator ("CC-2") and agreed that CHUA, through EMMCCO, would act as "exporter" in loan transactions brokered by CC-2 between Philippine borrowers and United States lending banks, in which the Ex-Im Bank was guaranteeing the loans.  CC-2 agreed to pay CHUA a fee of between 1.5-5% of the value of the purported goods to be shipped.

3.      In or about October 1999, CC-2 instructed CHUA that lending banks would

not pay loan proceeds to EMMCCO until the banks and the Ex-Im Bank received a Commercial

Invoice, Packing List, Bill of Lading, and Ex-Im Bank Supplier's Certificate documenting the

amount, value, and origin of United States goods shipped to the Philippines.

4.     From in or about November 1999 until January 2005, CHUA prepared false

Commercial Invoices and Packing Lists documenting approximately $10 million worth of United

States goods that he had purportedly purchased and shipped to the Philippine borrowers.  For

each transaction, both CHUA and CC-2 knew at the time these documents were prepared that the

representations made by CHUA on the Commercial Invoices and Packing Lists falsely

represented the amount, value, and origin of the United States goods shipped to the Philippines.

5.     From in or about November 1999 until January 2005, CHUA caused the

preparation of false Bills of Lading by sending the false Commercial Invoices to a freight

forwarder for the purpose of creating Bills of Lading that appeared to match the description of

goods contained on the false Commercial Invoices.  For each transaction, both CHUA and CC-2

knew at the time these documents were prepared that the Bills of Lading falsely represented the

type and amount of United States goods shipped to the Philippines.

6.     From in or about November 1999 until January 2005, CHUA prepared false Ex-

Im Bank Supplier's Certificates certifying that he had purchased and shipped approximately $10

million worth of United States goods to the Philippine borrowers.  For each transaction, both

CHUA and CC-2 knew at the time these documents were prepared that the representations made

by CHUA on the Ex-Im Bank Supplier's Certificates falsely represented the amount, value, and

origin of the goods shipped to the Philippines.

7.     From in or about November 1999 until January 2005, CHUA sent to Ex-Im Bank,

2

through the lending banks, the Commercial Invoices, Packing Lists, and Ex-Im Bank Supplier's Certificates that he prepared and the Bills of Lading that he caused to be prepared, as proof that he had purchased and shipped approximately $10 million worth of United States goods to the Philippine borrowers. For each transaction, both CHUA and CC-2 knew at the time that the Commercial Invoices, Packing Lists, Bills of Lading, and Ex-Im Bank Supplier's Certificates falsely represented the amount, value, and origin of the goods shipped to the Philippines.

8.    From in or about November 1999 until February 2005, EMMCCO and ECCO received approximately $10 million in loan proceeds from the lending banks based on CHUA's false representations to the lending banks and the Ex-Im Bank that EMMCCO and ECCO had spent approximately $10 million to purchase United States goods and had shipped those goods to the Philippines. CHUA and CC-2 knew at the time that CHUA had actually spent an amount materially and substantially less than $10 million on the goods purchased and shipped to the Philippines. After receiving the approximately $10 million in fraudulent loan proceeds, CHUA kept approximately $300,000 of the loan proceeds and transferred approximately $9 million of the loan proceeds to bank accounts owned and controlled by CC-2 and others.

9.    On or about February 12, 2004, CHUA knowingly caused to be delivered through Federal Express, a commercial interstate carrier, an Ex-Im Bank Supplier's Certificate to UPS Capital Business Credit, knowing at the time that it would be forwarded to the Ex-Im Bank. CHUA knew at the time that the pretenses, representations, and promises contained in the Ex-Im Bank Supplier's Certificate as to the amount, value, and origin of the goods shipped to the Philippines were materially false when made.

The preceding statement is a summary, made for the purpose of providing the Court with a factual basis for my guilty plea to the charges against me.  It does not include all of the facts known to me concerning criminal activity in which I and others engaged.  I make this statement knowingly and voluntarily and because I am in fact guilty of the crimes charged.

DATE: ___4/26/07___

_____
EDWARD CHUA
Defendant

_____
MITCHELL M. SELTZER, ESQ.
Attorney for Defendant